*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re A. T. DUNSTON, Minor.

UNPUBLISHED
June 22, 2023

Nos. 364009; 364353
Saginaw Circuit Court
Family Division
LC No. 21-049662-NA

Before: CAMERON, P.J., and MURRAY and GADOLA, JJ.

PER CURIAM.

In Docket No. 364009, respondent-mother appeals as of right the trial court's October 24, 2022 order terminating her parental rights to the minor child, ATD, following her voluntary release of her rights. In Docket No. 364353, respondent-father appeals as of right the trial court's November 28, 2022 order terminating his parental rights to ATD following a trial. [1] We affirm.

## I. BACKGROUND

On May 4, 2021, petitioner, the Department of Health and Human Services (DHHS), filed a petition to remove then eight-month-old ATD from respondent-mother's care. Investigation of a Children's Protective Services (CPS) neglect referral revealed illegal substances in the home as well as drug paraphernalia and empty baggies within ATD's reach. Respondent-mother had previously been diagnosed with bipolar disorder and depression and was exhibiting concerning behavior. She was taken to the hospital for mental health concerns and would be taken to jail upon her release for charges of child abuse and possession of a controlled substance. The court placed ATD in respondent-father's care under DHHS supervision with the conditions that he maintain a residence in Saginaw County, cooperate with DHHS, and allow visits to his residence to ensure ATD's safety due to his pending criminal charges for domestic violence.

Both parents entered pleas to an amended petition. Respondent-mother admitted that she had a substance abuse problem and mental health issues that negatively impacted her ability to

---

[1] This Court consolidated the cases for purposes of appeal. *In re Dunston*, unpublished order of the Court of Appeals, entered January 13, 2023 (Docket Nos. 364009, 364353).

parent ATD. Respondent-father admitted that he lacked the parenting skills to keep ATD safe from respondent-mother's substance abuse and mental health issues. The court took jurisdiction over ATD but she remained in the care of respondent-father.

On June 1, 2021, the court held an initial disposition hearing in which the parties discussed the case service plan and the parents' respective parent agency treatment plans. Respondent-father's treatment plan included counseling, parenting classes, and a psychological evaluation. Respondent-mother's treatment plan included in-patient substance abuse treatment, mental health treatment, a psychological evaluation, and drug screening twice weekly. The court scheduled another review hearing and encouraged the parties to begin participating in services immediately to work towards the goal of reunification. Respondent-father's plan was eventually amended to include a substance abuse evaluation, drug screens, and weekly therapy.

On July 1, 2021, respondent-father was arrested and jailed after allegedly pointing a gun at his former partner while ATD was in the home. The next day, the court held an emergency removal hearing on a supplemental petition. The court removed ATD from respondent-father's care and placed her in the home of her maternal aunt. On August 9, 2021, ATD was removed from her maternal aunt following an incident of domestic violence while respondent-mother was also residing in the home. ATD was placed with her maternal grandmother until November 17, 2021, when she was placed in a non-relative foster care home.

After fifteen months, respondent-mother and respondent-father still had not completed the services necessary to begin reunification with ATD. Respondent-mother attempted in-patient substance abuse treatment three times but was not successful. Both parents routinely missed drug screens. Progress was further interrupted in early 2022 when respondent-father moved to Chicago for about a five-month period. While respondent-father did complete a parenting class and a psychological evaluation, and was exercising his parenting time, his continued criminal activity and lack of housing made reunification increasingly difficult. Respondent-father was arrested again on July 9, 2022, for home invasion, assault, interfering with an electronic communications device, and domestic violence, and he still had pending charges from 2020 and 2021.

On August 8, 2022, the court held another dispositional review hearing/permanency planning hearing in which respondent-father appeared via Zoom from jail. Respondent-mother did not appear, as she recently had another baby. The case supervisor further testified that ATD's bond with respondent-father was being affected by the lapses in parenting time because of his move to Chicago and his incarceration. The court ordered DHHS to file a supplemental petition to terminate parental rights, but kept a concurrent goal of reunification so that services would be available.

A termination of parental rights hearing commenced on October 20, 2022. Respondent-mother made admissions to a supplemental petition and voluntarily released her parental rights. The court entered an order terminating respondent-mother's parental rights on October 24, 2022. The court held a bench trial on the petition to terminate respondent-father's parental rights. After hearing testimony from witnesses, including respondent-father himself, the trial court found that there was clear and convincing evidence supporting termination of respondent-father's parental rights under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist) and (*ii*) (additional conditions exist), (g) (failure to provide proper care and custody despite financial

means to do so), and (j) (risk of harm to child if returned to parent), and that termination of his parental rights was in the best interests of ATD. The court entered an order terminating respondent-father's parental rights on November 28, 2022.

## II. VOLUNTARY TERMINATION OF PARENTAL RIGHTS

Respondent-mother argues the trial court erred by finding that she knowingly, understandingly, and voluntarily released her parental rights to ATD. We disagree.

This Court reviews "the trial court's findings of fact under the clearly erroneous standard." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009); MCR 3.977(K). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). This Court is "obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.).

This Court reviews a trial court's decision regarding whether a respondent-parent's release of parental rights was made knowingly and voluntarily for an abuse of discretion. See *In re Blankenship*, 165 Mich App 706, 714; 418 NW2d 919 (1988).[2] However, because respondent-mother did not preserve her claim of error for appellate review, this Court's review is limited to determining whether she has established a plain error affecting her substantial rights. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). To establish her right to relief under the plain-error rule, respondent-mother must show that the trial court committed a plain or obvious error when it accepted her release of parental rights. *Id*.

"[A] respondent can consent to termination of his parental rights under the juvenile code, in which case the judge need not announce a statutory basis for it." *In re Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992). A relinquishment of a constitutional right is valid only if it was knowingly, understandingly, and voluntarily made. See *In re Pederson*, 331 Mich App 445, 464; 951 NW2d 704 (2020). And a relinquishment of parental rights must be knowingly and voluntarily made. See *In re Burns*, 236 Mich App 291, 292-293; 599 NW2d 783 (1999). See also *In re Curran*, 196 Mich App 380, 385; 493 NW2d 454 (1992).

At the beginning of the termination hearing, the court was informed that respondent-mother wanted to voluntarily release her parental rights to ATD. Respondent-mother's counsel stated that she had ample time to review with respondent-mother the supplemental petition containing three allegations and a stipulation for grounds to terminate, and that respondent-mother wished to proceed with the voluntary release of her parental rights. The court then engaged in the following colloquy with respondent-mother:

---

[2] This Court is not strictly required to follow uncontradicted opinions decided before November 1, 1990. MCR 7.125(J)(1). However, they are considered precedent and entitled to significantly greater deference than are unpublished cases. *Woodring v Phoenix Insurance Company*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018).

*Q.* So with that, if you wish to admit to the allegations in the petition, I must ask you whether or not you are going to be foregoing [sic] your right to have the department prove the allegations in the petition by a preponderance of the evidence.

*A.* Huh?

*Q.* Are you foregoing that right? You want to just admit, you don't want a trial. Is that true?

*A.* Yes.

*Q.* All right.

*A.* Yes.

*Q.* All right. And so you are going to not hold the department to prove the allegations in the petition. And that would be the longer petition. Are you foregoing your rights to a trial on those allegations?

*A.* Yes.

*Q.* All right. And included in that are you then foregoing your right to cross-examine witnesses who would testify against you?

*A.* Yes.

*Q.* Okay. And are you foregoing your right to have the court subpoena any witnesses for you to come in and testify on your side?

*A.* Yes.

*Q.* All right. And so with that you are giving up constitutional rights to an actual trial on the 18 page supplemental petition for purposes of termination. Do I understand you clearly?

*A.* Yes.

*Q.* All right. Has anybody threatened you or forced you to make admissions this morning to the supplement petition [sic] for voluntary termination of your parental rights? Has anybody threatened you or forced you to do this?

*A.* No.

*Q.* All right. And other than this amended petition has anybody promised you anything if you admit?

*A.* No.

*Q*. And do you understand that if you admit to these allegations and stipulate to grounds for termination the court is going to enter an order terminating your parental rights to [ATD]. You understand that?

*A*. Yes.

*Q*. All right. And have you taken any medication, drugs or alcohol that are affecting you this morning?

*A*. Just my mental health. No. I'm due for my shot today.

*Q*. Does it affect—is it affecting you at this time where you can't make a decision competently?

*A*. Mentally no. I—no.

*Q*. Let me ask it again. Have you taken medications, drugs or alcohol that are affecting you to the point where you can't make this decision today?

*A*. No.

*Q*. So you're thinking clearly and you do want to proceed?

*A*. Yes.

*Q*. Is there anything that's happened causing you to say that you want to admit these allegations when you do not want to?

*A*. No.

*Q*. You're doing this voluntarily and freely?

*A*. Yes.

The prosecutor then read the three allegations in the supplemental petition: (1) that respondent-mother admitted on May 17, 2021, that she had substance abuse problems and mental health concerns that negatively impacted her ability to parent her child, (2) respondent-mother has not rectified the barriers that exist to reunification, and (3) that it is in the best interest of the child that respondent-mother's parental rights be terminated. Respondent-mother agreed that she believed each allegation to be true. Respondent-mother's attorney assured the court that she had "ample time and opportunity to speak about this issue" with her client and she stipulated to the grounds for termination. The court found by a preponderance of the evidence that the grounds for termination had been proven by respondent-mother's admissions under oath.

Considering the record, the trial court did not err by concluding that respondent-mother's release of her parental rights was made knowingly and voluntarily. The trial court explored whether respondent-mother understood that she was giving up her parental rights to ATD, whether she had sufficient time to consider the decision, and whether her decision was coerced.

Respondent-mother's counsel indicated that she had time to discuss with respondent-mother the decision to release her rights. In addition, respondent-mother clearly understood that she was terminating her parental rights to ATD. Respondent-mother affirmed that her decision to release her parental rights was voluntary and that she was not threatened, coerced, or promised anything in exchange for her release. The trial court questioned respondent-mother regarding her mental state, including whether she had taken any medication, drugs, or alcohol that was affecting her ability to make a decision competently at the time. Respondent-mother replied, "Just my mental health. No." It appears that respondent-mother was indicating that the only medication she had taken was her mental health medication and that it was not affecting her ability to make a competent decision.

The court thoroughly explained the consequences of respondent-mother's release of her parental rights, and respondent-mother affirmed that she understood. After respondent-mother made her admissions, the court again asked her whether she entered into the plea "clearly without being fogged by medication . . . to the point where you're not able to do this with a clear head?" Respondent-mother said, "I'm trying. I'm trying." Respondent-mother denied that there was anything "mentally" that might affect her decision. Indeed, on appeal, respondent-mother acknowledges that she stated at the hearing that her mental health "wasn't preventing her from entering a competent plea." While there can be no dispute that mother has mental health issues given her diagnoses of borderline personality disorder and post-traumatic stress disorder, respondent-mother has not pointed to any evidence indicating that her mental health issues precluded her from knowingly and voluntarily relinquishing her parental rights. Indeed, the psychological evaluation on which respondent-mother relies on appeal indicates with respect to cognitive functioning that she fell within the average range and that she "does not have any clinically significant intellectual impairment, and is able to read and write at expected levels." Respondent-mother's statements at the hearing do not indicate that she lacked the competency to understand what she was doing.

The record reveals that the trial court conducted a sufficient inquiry and the hearing transcript reveals that respondent-mother's release was knowing and voluntary. See *Curran*, 196 Mich App at 385. Therefore, the trial court did not plainly err by relying on its colloquy with respondent-mother in accepting her release of her parental rights to ATD. See *VanDalen*, 293 Mich App at 135.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Respondent-mother argues that her trial counsel was ineffective for failing to raise the issue of whether respondent-mother was an incapacitated individual in need of a limited adult guardian under MCL 700.5306 to assist her in understanding the services available to her. We disagree.

Generally, "[w]hether counsel was ineffective presents a mixed question of fact and constitutional law, which we review, respectively, for clear error and de novo." *In re Mota*, 334 Mich App 300, 318; 964 NW2d 881 (2020). Because respondent-mother did not raise the issue of ineffective assistance of counsel by moving for a new trial or for an evidentiary hearing, this Court's review is limited to mistakes apparent from the record. *People v Carll*, 322 Mich App 690, 702; 915 NW2d 387 (2018).

A parent involved in a child-protective proceeding is entitled to the effective assistance of counsel. *In re Casto Minors*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 357656); slip op at 9, citing *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). To succeed on an ineffective-assistance-of-counsel claim, the respondent must show "(1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). Counsel is presumed to have afforded effective assistance, and a respondent has the burden of proving otherwise. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). A respondent also has the burden of establishing the factual predicate of her ineffective-assistance claim. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014).

The Estates and Protected Individuals Code (EPIC), MCL 700.1 *et seq*., governs the appointment of guardians for incapacitated individuals. MCL 700.5303(1) states that "[a]n individual in his or her own behalf, or any person interested in the individual's welfare, may petition for a finding of incapacity and appointment of a guardian." If the court finds by clear and convincing evidence that an individual is incapacitated and that a guardian is necessary as a means of providing care and supervision, the court may appoint a guardian. MCL 700.5306(1).

Respondent-mother argues that her "attorney had enough information to inquire whether Appellant Mother was either incapacitated or suffered a disability that would require more specialized services or additional assistance to understand those services required." Respondent-mother cites three pieces of information that should have led her attorney to request a limited legal adult guardian: (1) respondent-mother started the case in a mental health facility and ended it with a recommendation for a psychiatric evaluation and psychotherapy sessions, (2) the CASA, who was a teacher at respondent-mother's elementary school and knew her as a child, informed the court that respondent-mother had a learning disability as a child, and (3) the transcripts established that respondent-mother was confused and there is a reasonable probability the outcome would have been different if she had the help she needed.

Respondent-mother is correct that counsel and the trial court were aware of her mental health issues and childhood learning disability. However, it does not follow that trial counsel is ineffective for failing to request a guardian for respondent-mother to help her under these circumstances. Considering that trial counsel also knew that respondent-mother had undergone a psychological evaluation and that evaluation revealed that she "does not have any clinically significant intellectual impairment," it was reasonable for trial counsel not to request a guardianship. The psychological evaluator's clinical opinion was that respondent-mother "functions within Average range—reasoning, insight, and judgment are good[,]" and that respondent-mother "presented average in memory, communication, and executive functioning." Despite diagnosing respondent-mother with mental health and substance abuse disorders, the evaluator did not opine that mother was incapacitated or needed a guardian. Under these circumstances and on this record, counsel's failure to "inquire about whether mother was incapacitated or suffered a disability" did not fall below an objective standard of reasonableness. Respondent-mother has failed to demonstrate that she was denied the effective assistance of counsel.

## IV. BEST INTERESTS OF THE CHILD

Respondent-father argues that the trial court clearly erred by finding that termination of his parental rights was in ATD's best interests because the trial court failed to give sufficient weight to his bond with ATD, to his appropriate parenting skills during parenting time visits, and to his progress in overcoming barriers to reunification. We disagree.

This Court reviews the trial court's determination of best interests for clear error. *In re Sanborn*, 337 Mich App 252, 272, 276; 976 NW2d 44 (2021). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 272-273 (quotation marks and citation omitted).

"Even if the trial court finds that [DHHS] has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015), citing MCL 712A.19b(5). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Factors to consider include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *Gonzales/Martinez*, 210 Mich App at 434. Other relevant considerations are the parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child's well-being while in their care, and the possibility of adoption. *White*, 303 Mich App at 714. In addition, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *VanDalen*, 293 Mich App at 142.

Respondent-father does not challenge the trial court's findings. Rather, he contends that the court did not give sufficient weight to certain of its findings. This Court, however, gives deference to a trial court's special opportunity to judge the weight of the evidence. *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014).

After the trial court took respondent-mother's plea and terminated her parental rights, the hearing then turned into a trial on termination of respondent-father's parental rights. First to testify was Machaela Navilynn, the foster care supervisor with the Ennis Center for Children. Before Ms. Navilynn was a supervisor at the Ennis Center, she was the foster care case manager assigned to respondent-father's case. She believed that respondent-father made no progress in therapy because of the infrequent sessions. From the initial referral in October 2021 to the date of the hearing, respondent-father attended only eight out of approximately 45 weekly therapy sessions for anger management therapy and domestic violence counseling. He was charged with domestic violence twice as this case progressed. Respondent-father reported that he had completed a psychiatric evaluation at Saginaw Community Mental Health on May 27, 2022, but the facility had no record of it. Respondent-father successfully completed parenting classes on June 28, 2022, but Ms. Navilynn felt that he had not benefited from the classes because he continued his criminal behavior, which prevented him from parenting ATD.

According to Ms. Navilynn, respondent-father was not consistent with his parenting times, even when some were offered virtually when respondent-father was out of state. From July to October 2021, respondent-father was offered three visits and attended two. From October 2021 to January 2022, he attended seven out of 18 visits. From January to March 2022, he attended 11 out of 14 visits. From March to May 2022, he attended 13 out of 18 visits. From May to August 2022, he attended eight out of 18 visits. Since his release from jail on September 20, 2022, respondent-father attended eight out of nine visits.

Ms. Navilynn further testified that ATD had spent the majority of her life in foster care and that there was no reasonable likelihood that would change within a reasonable time because respondent-father had spent a good part of that time either incarcerated or living out of state and not participating in services. She believed that it was in ATD's best interests for respondent-father's parental rights to be terminated because ATD needed stability and permanency respondent-father could not provide. Ms. Navilynn testified that it was clear a bond existed between ATD and respondent-father, but it was a problem for ATD to be bonded with respondent-father and then have him leave for multiple months to go to another state or to jail. The situation created stress for ATD. After nearly 17 months, the foster care case manager testified, respondent-father was dealing with the same issues as when the case began, and he had not substantially complied with the parent agency treatment plan.

The trial court addressed ATD's best interests, considering the relevant factors. ATD had a bond with respondent-father, but she also had a bond with the foster parent. Respondent-father's participation in parenting time was sporadic and impacted the bond that he had with ATD, and he never progressed to unsupervised parenting time. He admitted that his relationships were plagued with domestic violence. His domestic violence and anger issues resulted in multiple criminal charges, some of which resulted from incidents that occurred in the presence of ATD while this case was open. Respondent-father failed to participate in many of the recommended services and did not benefit from those in which he did participate. He attended only eight out of more than 40 therapy sessions to deal with his domestic violence and anger issues. He was diagnosed with severe cannabis use disorder, but he failed to have a substance use assessment or to drug test regularly. He tested positive for THC when he did test, and he tested positive twice for methamphetamine and amphetamine. Respondent-father believed that he could self-medicate with marijuana to treat his mental health issues. There was no evidence that he completed a psychiatric evaluation as recommended. Respondent-father had not obtained housing. ATD was two years old and had been in placement for nearly 17 months. She needed permanency, stability, and finality. She was doing well in her foster care placement. The foster parent was willing to provide permanency for ATD. Considering all the evidence, and giving deference to the trial court's special opportunity to judge the weight of the evidence, the trial court did not err by finding by a preponderance of the evidence that termination of respondent-father's parental rights was in ATD's best interests.

In Docket No. 364009, we affirm the order terminating respondent-mother's parental rights. In Docket No. 364353, we affirm the order terminating respondent-father's parental rights.

/s/ Thomas C. Cameron
/s/ Christopher M. Murray
/s/ Michael F. Gadola